IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **PAMELA G. TOOLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 14-cv-025-CJP**[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Pamela G. Tooley, represented by counsel, seeks judicial review of the final agency decision denying her Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Ms. Tooley applied for benefits in December, 2010, alleging disability beginning on January 1, 1990.  (Tr. 18).  After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application on October 10, 2012.  (Tr. 18-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 16.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.      The ALJ erred in analyzing the medical opinions of Dr. Boyd, Sharon Szatkowski and Kristi Kinney.

2.      The ALJ erred in assessing plaintiff's credibility by placing undue weight on her activities of daily living.

3.      The RFC assessment was erroneous because of the above two errors.

4.      The ALJ failed to properly assess whether plaintiff met Listing 12.04C.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C.**

---

[2]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

**§423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work

experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Ms. Tooley was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th**

Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that Ms. Tooley had not been engaged in substantial gainful activity since the alleged onset date, and, further, she had no past relevant work experience. He found that plaintiff had severe impairments of fibromyalgia syndrome, osteoarthritis including degenerative changes in the lumbar and cervical spine, Raynaud's phenomenon, dysthymic disorder, and personality disorder with obsessive and dependent features.[3]   The ALJ further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Tooley had the residual functional capacity (RFC) to

---

[3] "Raynaud's (ray-NOHZ) disease causes some areas of your body — such as your fingers and toes — to feel numb and cold in response to cold temperatures or stress."   www.mayoclinic.org/diseases -conditions/raynauds-disease/basics/definition/CON-20022916, visited on June 11, 2015.

perform work at the medium exertional level, with physical and mental limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the national economy.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

1.    **Agency Forms**

Plaintiff was born in 1961 and was 28 years old on the alleged date of onset. (Tr. 132).   She was 49 years old when she applied for benefits.   She was 5'6" tall and weighed 145 pounds.   (Tr. 136).   She graduated from high school.   (Tr. 137).

Plaintiff said she was unable to work because of fibromyalgia, OCD, depression, panic attacks, Raynaud's syndrome, back pain, high blood pressure and heart problems.   (Tr. 136).

2.    **Activity Log**

Plaintiff maintained a hand-written Activity Log for the week of December 1, 2011.   (Tr. 174-176).   She reported that she mostly sat on the couch watching TV or searched for medical information on a computer.   She did not record any obsessive compulsive hand washing or other behaviors.

### 3.    Evidentiary Hearing

Ms. Tooley was represented by an attorney at the evidentiary hearing on September 24, 2012.   (Tr. 41).   Plaintiff was 51 years old at the time of the hearing.   She lived with her parents.   She had never lived on her own.   She had health insurance, which her parents provided for her.   Her longest job was at Wal-Mart, from the middle of 2001 to the middle of 2002.   (Tr. 44-45).

Plaintiff testified that the main thing that kept her from working was the pain from fibromyalgia.   (Tr. 46).

Her mental conditions were depression, anxiety and OCD.   She washed her hands "a lot" and straightened things up.   She washed her hands about ten times a day.   (Tr. 53).   She was taking Amitriptyline (Elavil), prescribed by her family care physician.   She had previously been in counseling.   She no longer saw the counselor, Ms. Kinney, because her anxiety attacks had resolved.   (Tr. 54-56).

A vocational expert (VE) also testified.   The ALJ asked her a series of hypothetical questions.   The first one corresponded to the ultimate RFC findings, that is, a person of plaintiff's age and educational background who could do medium work, limited to only frequent reaching, handling and fingering, with no concentrated exposure to extreme cold, and limited to only rote or routine instructions that require the exercise of little independent judgment or decision-making for two-hour work segments.   She should work in a stable setting where there is little change, in a task or object oriented setting, and in an environment where the supervisors are on-site and readily available, but not always

in the immediate area.   The VE testified that this person could do the jobs of housekeeper/cleaner, linen room attendant, and laundry worker.   (Tr. 59-63).

### 4.    Medical Records

In 1993, a rheumatologist diagnosed plaintiff with fibromyalgia. (Tr. 323-324).   In May, 1994, he advised her to continue doing aerobic exercises and to take Amitriptyline.   (Tr. 320).

A 2001 record indicated that Ms. Tooley, then 39 years old, lived with her parents.   Her father was confined to a wheelchair and had problems with post-polio syndrome.   (Tr. 279).

Ms. Tooley was evaluated at the Mayo Clinic in 2004.   The relevant final diagnoses were obsessive-compulsive disorder with depression, "rule out" fibromyalgia, and hand eczema.   (Tr. 292-297).   The records note that she had no history of hospitalizations for depression.   (Tr. 296).   It was also noted that she "could" have fibromyalgia, and serology studies had been negative.   (Tr. 297).

Plaintiff received primary health care from Dr. Ashok Kumar.   (Tr. 411-420, 540-555, 566-606).   He included osteoarthritis in his assessment on most visits, but did not include fibromyalgia.   In 2009 and most of 2010, Dr. Kumar recorded his office notes on a check-off form.   On all visits where the form was used, he checked boxes indicating that she was in no apparent distress, was "conversant, pleasant" and oriented, and she had an appropriate affect and intact judgment. (Tr. 414-420).   In December, 2010, he noted that she had anxiety.   He prescribed Buspar, an anti-anxiety drug, 5 milligrams, twice a day.   (Tr. 413).   In January,

2011, the assessment no longer included anxiety.   (Tr. 411).

In April, May and June, 2011, Dr. Kumar again used the check-off form to record office notes.   He saw her 3 times and again checked boxes indicating that she was in no apparent distress, was "conversant, pleasant" and oriented, and she had an appropriate affect and intact judgment.   (Tr. 550-553).   He made the same notes in September, 2011.   (Tr. 570, 575).   He made the same notes on October 12, 2011, but also included depression in the assessment.   At that visit, plaintiff complained of arthralgias and myalgia, mostly in the back of the neck and shoulder regions.   (Tr. 569).   On October 28, 2011, she complained of backache, cervical pain and shoulder pain.   There was no mention of depression or anxiety.   Dr. Kumar again checked boxes indicating that she was in no apparent distress, was "conversant, pleasant" and oriented, and she had an appropriate affect and intact judgment.   (Tr. 568).   He noted that she was "feeling better" on November 17, 2011, and checked the same boxes, but again included depression in the assessment.   He prescribed Amitriptyline (Elavil), which is used to treat both depression and pain.   See, http://www.drugs.com/amitriptyline.html, visited on June 12, 2015.   (Tr. 567).

On January 12, 2012, Dr. Kumar again checked boxes indicating that she was in no apparent distress, was "conversant, pleasant" and oriented, and she had an appropriate affect and intact judgment.   He did not include depression or anxiety in his assessment, but did prescribe Amitriptyline.   (Tr. 606).   In March, 2012, Dr. Kumar did not mention depression or anxiety, but he prescribed

Nortriptyline, a drug used to treat depression.   See, http://www.drugs.com /nortriptyline.html, visited on June 12, 2015.   (Tr. 605).

In May, 2012, Dr. Kumar noted depression.   In June, 2012, Dr. Kumar included osteoarthritis of the lumbosacral spine in his assessment, but there was no mention of depression or anxiety.   Her medications included Nortriptyline. (Tr. 604).

On a number of visits from December 1, 2010, through June, 2012, Dr. Kumar noted that plaintiff had "no arthralgia or myalgia."   (Tr. 412, 413, 555, 576, 578, 595, 596, 597, 602, 603, 605).

On April 12, 2011, Jerry L. Boyd, Ph.D., performed a consultative psychological exam of plaintiff.   (Tr. 506-510).   Plaintiff told him that she had suffered depressive symptoms for at least 20 years, and had suffered from anxiety for the past 2 years.   The only mental health treatment she reported was that she had been seen at the Mayo Clinic in the past, and had been in counseling with Kristi Kinney for the past 2 months.   She was not taking any psychotropic medications. Regarding her perception of her ability to be employed in the future, Ms. Tooley said, "I don't know, with all the pain."   She told Dr. Boyd that she had never lived independently.   She said that she had OCD symptoms that included washing her hands/arms at least 3 times on at least 9 occasions a day.   He noted that her hands were red and chapped.   She said that she spent her days watching TV, using a computer, or doing household chores with her mother's help.   On exam, she was alert and oriented.   Attention, concentration and short-term memory showed mild

impairment.    Remote memory was intact.    Dr. Boyd estimated that her intelligence was in the low average range.    Judgment and maturity were slightly below her age level.    Insight was fair.    Her thought processes were normal in flow, form and content.    Speech was productive, coherent and fluent.    Her mood was reportedly sad.    Self-esteem was decreased.    Dr. Boyd gave an Axis I diagnosis of dysthymic disorder, and an Axis II diagnosis of personality disorder with OCD, passive-dependent features (severe).    He assessed her GAF at 47.    He concluded that she could follow moderately complex instructions and would need frequent supervision.    In addition, she had a reduced stress tolerance and "reduced persistence related to the chronic pain and depressive symptoms."    He noted that her OCD and passive dependent features cause her to lack adaptability, have "excessive inefficiency," and very low self-confidence.    He concluded that she would be able to manage her own funds if benefits were to be awarded.

Dr. Vittal Chapa performed a consultative physical exam on the same day. (Tr. 512-517).    The exam was basically normal.    Dr. Chapa noted that she was alert and oriented, was able to answer questions appropriately, and was in good contact with reality.

Ms. Tooley received counselling services from Kristi Kinney, a licensed clinical professional counselor, at Caring Solutions Counseling in late 2010 and 2011.  Ms. Kinney wrote a letter, dated July 21, 2011, stating that plaintiff was "completely dependent on her parents" and was "unable to live on her own."    She stated that plaintiff had a "substantial mental health and psychiatric history which

includes suicidal thoughts, self harming behaviors and hospitalizations."
According to Ms. Kinney, plaintiff was often in the bathroom for up to 6 hours
because she was "performing cleaning rituals." She had frequent panic attacks
and was so fearful that she was unable to form substantial relationships outside her
family. Ms. Kinney stated that plaintiff's mental health impairments prevented her
from maintaining employment. (Tr. 557-558).

Sharon Szatkowski, a psychiatric-mental health clinical nurse specialist
(PMHCHS), treated plaintiff at Southern Illinois Healthcare Foundation. At the
first visit on September 16, 2011, Ms. Szatkowski performed an initial psychiatric
evaluation. She noted that Ms. Tooley had been referred by counselor Kristi
Kinney. Ms. Tooley complained of "OCD." She said that she had to have things
organized and she "worried" about the bathroom. She had to wash her hands and
then clean the bathroom and then wash her hands again. It became a "vicious
cycle." She said had been doing this since 2001. She had seen a psychiatrist at
the Mayo Clinic in 2004, but had not followed up with a psychiatrist at home. She
was seeing a counselor. She had no psychiatric hospitalizations. On exam,
plaintiff was alert and oriented. Eye contact and mood were fair. Affect was flat,
blunted, limited and constricted. Her thought process was concrete. Judgment
and insight were fair. The Axis I diagnoses were OCD and depression. Her GAF
was assessed at 40-45. Ms. Szatkowski recommended that she stop taking

Gabapentin and start taking Zoloft and Cymbalta.[4]   (Tr. 614-618).

Ms. Szatkowski saw plaintiff 6 more times through February 16, 2012.   In October, 2011, plaintiff was washing her arms and hands twice a day.   She had restarted Gabapentin because she was in pain without it.   She could not take Cymbalta because it made her hair fall out.   Ms. Szatkowski told her to increase Zoloft for OCD symptoms and to take Trazadone for insomnia.   (Tr. 613).   On November 1, 2011, Ms. Szatkowski recommended Amitriptyline (Elavil) instead of Zoloft and Trazadone because of side effects.   (Tr. 612).   At the next 3 visits, Ms. Tooley reported that she was doing better and was eating and sleeping well, although she did report some OCD symptoms.   (Tr. 609-611).   At the last visit, on February 16, 2012, Ms. Tooley was "doing well" on Amitriptyline.   She was described as pleasant and smiling.   Her moods were better.   On exam, she was alert and oriented.   Her affect was appropriate.   Her thought process was logical and goal directed.   Judgment was fair.   She had no cognitive impairment.   Ms. Szatkowski recommended that she continue taking Amitriptyline.   She did not assess plaintiff's GAF score again after the initial evaluation.

## Analysis

Plaintiff first argues that the ALJ erred in analyzing the "medical opinions" of Dr. Boyd, Ms. Szatkowski and Ms. Kinney.

---

[4] It is unclear whether Ms. Szatkowski actually prescribed medications for plaintiff.   In Illinois, a nurse who qualifies as an "advanced practice nurse" is authorized to prescribe medications under certain circumstances.   See, https://www.idfpr.com/Renewals/Apply/forms/f1880apn.pdf, visited on June 15, 2015.

Dr. Boyd is a psychologist who examined plaintiff at the request of the agency, but did not treat her.   As he is not a treating source, his opinions are not entitled to controlling weight under 20 C.F.R. §404.1527(c)(2).   Rather, the ALJ was required to consider all of the factors set forth in §404.1527(c)(1) through (c)(6) in determining how much weight to give his opinion.

Here, ALJ Janney considered Dr. Boyd's opinion and, in fact, incorporated many of his conclusions into his RFC assessment.   ALJ Janney accepted Dr. Boyd's opinion that plaintiff had reduced ability to tolerate stress, would have difficulty adapting, and would require a lot of supervision.   He also accepted Dr. Boyd's findings that Ms. Tooley had mild deficits of concentration and attention, and factored those limitations into his RFC assessment.    Further, he limited her to only simple tasks.   See, Tr. 25-26.

Plaintiff's only concrete complaint about the ALJ's weighing of Dr. Boyd's opinion is that the ALJ gave "reduced weight" to Dr. Boyd's assessment of Ms. Tooley's GAF score.[5]

ALJ Janney correctly noted that a GAF score "is based upon a hypothetical continuum and by itself is not an exertional or nonexertional vocational factor suitable for a residual functional capacity profile."   (Tr. 26).   A GAF score is a measure of both the severity of symptoms *and* the patient's functional level.   The

---

[5] "The fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of 'its conceptual lack of clarity ... and questionable psychometrics in routine practice.' American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed.2013).)" *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014).

score reflects the worst of the two and "does not reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).   An ALJ is not required to base his conclusion as to disability only upon an "unexplained numerical score."   *Ibid*.

*Denton* involved a consultative examination by Dr. Jerry Boyd, the same psychologist involved in this case.   The Seventh Circuit concluded that the ALJ was justified in rejecting the GAF score and relying instead on Dr. Boyd's narrative findings.   *Ibid*.   Here, too, the ALJ's handling of the GAF score assessed by Dr. Boyd was not erroneous.   The ALJ did not ignore the GAF score, but correctly gave it less weight than he gave to Dr. Boyd's narrative findings.   In addition to his observations about the nature and significance of GAF scores, the ALJ pointed out that plaintiff was not taking any psychotropic medications at the time of Dr. Boyd's exam, but she had responded well to medications prescribed after she began treating with Ms. Szatkowski.   See, Tr. 25-26.   Plaintiff has not demonstrated any error with respect to the handling of Dr. Boyd's opinion.

As for the other opinions, Ms. Szatkowski is a psychiatric-mental health clinical nurse specialist and Ms. Kinney is a licensed clinical professional counselor.   Under the applicable regulation, neither is an "acceptable medical source."   20 C.F.R. §404.1513(a).   As such, their reports do not constitute "medical opinions."   See, 20 C.F.R. §404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources. . . .)"

Because Ms. Szatkowski and Ms. Kinney are not acceptable medical sources, they are not considered treating sources; their opinions are not considered to be "medical opinions" and are not entitled to any special weight under §404.1527(c). SSR 06-03p, 2006 WL 2329939, at *2.   This does not mean, however, that the ALJ may simply ignore the opinions of medical sources such as Ms. Szatkowski and Ms. Kinney.   The ALJ is required to consider "all relevant evidence" and may, as appropriate, consider the factors set forth in §404.1527(c) in the process of weighing the opinions of nonacceptable medical sources.   SSR 06-3p, at * 4-5.

Contrary to plaintiff's argument, the ALJ here did not ignore the opinions in issue.   He gave reduced weight to the GAF score assessed by Ms. Szatkowski for the same reasons he rejected Dr. Boyd's GAF score.   He also relied on the fact that Ms. Tooley did not seek mental health treatment for a number of years until she applied for disability benefits and Southern Illinois Healthcare Foundation's treatment records demonstrate that she responded well to medication.   As the ALJ noted, Ms. Szatkowski only assessed plaintiff's GAF score at the initial intake interview.   (Tr. 25-26).

The ALJ rejected Ms. Kinney's opinion because it was "long on claimant's subjective descriptions of her problems and limitations, and short on any objective clinical findings. . . ."[6]   An ALJ may reject an opinion that is based on a claimant's subjective complaints.  *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).   In

---

[6] Ms. Kinney's office notes were not made part of the record.  As plaintiff was represented by counsel at the agency level, the ALJ was entitled to assume that she had made her "strongest case for benefits."  *Glenn v. Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir. 1987).

addition, the ALJ pointed out that Ms. Kinney's statement that plaintiff sometimes spent up to 6 hours in the bathroom "performing cleaning rituals" was not substantiated by plaintiff's own Activity Log. (Tr. 26). These are valid reasons, and, contrary to plaintiff's argument, these reasons indicate that the ALJ did, in fact, consider the §1527(c) factors.

Plaintiff's next attacks the ALJ's credibility analysis.

The Court must use an "extremely deferential" standard in reviewing an ALJ's credibility finding. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). The Court cannot reweigh the facts or reconsider the evidence, and can upset the ALJ's finding only if it is "patently wrong." *Ibid*. Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3. While plaintiff's claims cannot be rejected solely because they are not supported by objective evidence, 20 C.F.R.

§404.1529(c)(2), the ALJ may take that fact into consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Here, ALJ Janney gave a number of reasons for his adverse credibility finding.   He pointed out that Ms. Tooley had not sought mental health treatment until she filed for disability benefits.[7]   The Activity Log she submitted did not document that she spent time engaged in obsessive compulsive rituals or behaviors. The records of Southern Illinois Healthcare Foundation indicate that her mental condition improved with appropriate medication.   At the last visit, she was sleeping and eating satisfactorily, was pleasant and cooperative, and was engaging in more activities.   Dr. Kumar consistently recorded in his office notes that she denied myalgia and arthralgia.   She had only conservative treatment for her physical complaints and had not taken narcotic pain medication.   Dr. Kumar's notes as well as Dr. Chapa's examination did not document significant trigger points or severe tenderness.   Dr. Chapa's examination was essentially normal. The ALJ considered plaintiff's allegations of side effects from her medications, but also considered the fact that Dr. Kumar and Ms. Szatkowski adjusted her medications to relieve those side effects.   The ALJ also observed that Ms. Tooley did not display signs of significant mental distress or confusion at the hearing. Lastly, while recognizing that Ms. Tooley was "obviously quite dependent on her

---

[7] Ms. Tooley testified that she had health insurance coverage, and she has not argued that there was any impediment to her obtaining health care.

parents," he also observed that she was able to leave her home to attend doctor's visits and other functions, shop, drive a car, use a computer and assist with some household chores.

Plaintiff advances only two specific criticisms of the ALJ's credibility analysis.  She takes issue with the ALJ's observation that she did not display mental distress or confusion at the hearing, citing two instances in which she did not understand a question and one in which she forgot a question.    The Court has examined the transcript and concludes that the incidents cited by plaintiff (Tr. 45, 50-51, 54) were minor and do not establish that the ALJ's observation about her condition at the hearing was inaccurate.   When the ALJ rephrased the questions she did not understand, she was readily able to answer them.

Plaintiff also argues that the ALJ erroneously equated her limited daily activities with an ability to work full-time.   It is true that the Seventh Circuit has cautioned ALJs about equating ability to engage in some daily activities with an ability to work full-time because daily activities allow for flexible scheduling and assistance from others, and do not require a minimum standard of performance.  See, *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014), and cases cited therein.  Here, however, the ALJ did not equate Ms. Tooley's daily activities with an ability to work full-time.

The statement about plaintiff's daily activities was made in the context of assessing plaintiff's mental impairments.    The ALJ stated that plaintiff is "obviously quite dependent on her parents, but nonetheless is able to leave her

home regularly to attend her doctors' appointments and other functions, shop, drive a motor vehicle, use a computer, and assist with some household chores." (Tr. 25).   Rather than equating daily activities with an ability to work full-time, the ALJ was pointing out that Ms. Tooley was not completely unable to function independently of her parents.

Plaintiff seems to be suggesting that it is always error for the ALJ to remark upon a claimant's daily activities.   This is not the case.   An ALJ is required to consider, among other factors, a claimant's daily activities in determining whether she is disabled.   20 C.F.R. §404.1529(a), SSR 96-7p, at *3.   While it may be error to equate limited daily activities with the ability to work full-time, it is not error to consider daily activities; in fact, is proper for an ALJ to consider a conflict between the plaintiff's claims about what she can do and the evidence as to her activities. See, *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013).

Plaintiff's third point is a rehash of her first two points, and is denied for the reasons set forth above.

For her last point, plaintiff argues that the ALJ erred in failing to adequately discuss whether she met the "C" criteria of Listing 12.04, Affective Disorders.   This argument is a complete non-starter.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.   In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."   20

C.F.R. §404.1525(d).   The claimant bears the burden of proving that she meets or equals a listed impairment.   *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

> The pertinent requirements of Listing 12.04C are
>
> Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.   Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied:
> . . . .
>
> C.    Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> . . . .
>
> 3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ considered whether plaintiff met the requirements of Listings 12.04 and 12.08 at Tr. 21-22.   He noted that she did not meet the paragraph B requirements of either listing, which plaintiff does not dispute.   He also found that she did not meet the paragraph C requirements.    Plaintiff argues that he should have more fully discussed the paragraph C requirements.   Specifically, plaintiff argues that she is unable to function outside the "very structured environment" of her parents' home.   Plaintiff relies on Ms. Kinney's report to substantiate her

argument.   However, as the Court has already explained, the ALJ was justified in discounting Ms. Kinney's report.

There is no evidence in the record that Ms. Tooley's home constitutes a "highly supportive living arrangement" within the meaning of the Listing.   Section 12.00(F) elaborates on the meaning of such a living arrangement; that section refers to "[h]ighly structured and supportive settings" and gives examples such as hospitals, halfway houses, and "board and care" facilities.   That section does provide that a claimant's home may function as a highly structured and supportive living arrangement.   The problem for plaintiff here is that there is no evidence in the record to establish that her home functioned in such a manner.   Plaintiff's argument that she is "dependent" on her parents is not evidence establishing that her home in fact functioned as a highly structured and supporting living arrangement.   See, *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015)("[A]ssertions in briefs are not evidence, nor in this case based on evidence.")

The ALJ relied in part on the opinions of state agency consultants who reviewed the evidence and concluded that plaintiff did not meet the requirements of a Listing.   See, Tr. 23.   This was proper.   An ALJ may rely on a state agency consultant's opinion that plaintiff did not meet a Listing where no other doctor has expressed a contradictory opinion.   *Filus*, 694 F.3d at 867.

In sum, none of plaintiff's arguments are persuasive.   Even if reasonable minds could differ as to whether Ms. Tooley was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the

Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). ALJ Janney's decision is supported by substantial evidence, and so must be affirmed.

## **Conclusion**

After careful review of the record as a whole, the Court is convinced that ALJ Janney committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Pamela G. Tooley's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE:  June 18, 2015.**



**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**